**LA PORTE v. UNITED STATES RADIUM CORPORATION.**

District Court, D. New Jersey.
Dec. 17, 1935.

Milton M. Unger, of Newark, N. J. (Leonard J. Emmerglick, of Newark, N. J., of counsel), for plaintiff.

Collins & Corbin (by Edward Markley) and Edwards, Smith & Dawson (by Edwin F. Smith), all of Jersey City, N. J., for defendant.

FORMAN, District Judge.

The principal question in this suit is whether or not the plaintiff, in an action at law for damages caused by injuries to the plaintiff's intestate and her subsequent death, is entitled to an injunction restraining the defendant from pleading the statute of limitations as a bar to the plaintiff's alleged cause of action at law on the ground of equitable fraud.

Irene F. La Porte, the plaintiff's intestate, was employed by the defendant, the United States Radium Corporation, from May 14, 1917, to December 11, 1918, and for a brief period of not over six weeks in 1920.

The decedent was employed to paint the dials of inexpensive watches with a luminous paint containing small quantities of the element radium in the form of a sulphate. While the decedent was in the employ of the defendant, no precautions were taken to prevent dial painters from being exposed to the small quantity of radium sulphate, an insoluble salt, and the radium emanation present in the air of their workrooms.

The decedent was one of eighty girls who worked for five and one-half days per week in a large factory room ventilated by a skylight and by windows around the room. The windows were regulated by any of the girls who saw fit to do so. They worked at four rows of tables extending practically the length of the room. Each girl worked a few feet away from the girl next to her and a few feet away from the girl at the opposite side of the table. Each girl procured a tray containing twenty-four watch dials and the material to be used to paint the numerals upon them so that they would appear luminous. The material was a powder, of about the consistency of cosmetic powder, and consisted of phosphorescent zinc sulphide mixed with radium sulphate. This compound was contained in a small vial about an inch and one-half long and about the size of an ordinary lead pencil in diameter. The powder was poured from the vial into a small porcelain crucible, about the size of a thimble. A quantity of gum arabic, as an adhesive, and a thinner of water were then added, and this was stirred with a small glass rod until a paint-like substance resulted. In the course of a working week each girl painted the dials contained on twenty-two to forty-four such trays, depending upon the speed with which she worked, and used a vial of powder for each tray. When the paint-like substance was produced a girl would employ it in painting the figures on a watch dial. There were fourteen numerals, the figure six being omitted. In the painting each girl used a very fine brush of camel's hair containing about thirty hairs. In order to obtain the fine lines which the work required, a girl would place the bristles in her mouth, and by the action of her tongue and lips bring the bristles to a fine point. The brush was then dipped into the paint, the figures painted upon the dial until more paint was required or until the paint on the brush dried and hardened, when the brush was dipped into a small crucible of water. This water remained in the crucible without change for a day or perhaps two days. The brush would then be repointed in the mouth and dipped into the paint or even repointed in such manner after being dipped into the paint itself, in a continuous process. Some girls painted an entire dial with a single pointing of the brush. Some re-pointed the brush after each numeral.

It appears that the radium used by decedent had between 8 and 30 micrograms of radium element to one gram of zinc sulphide; and 1,000 micrograms equal one milligram and 1,000 milligrams equal one gram. At any rate, the maximum quantity the decedent might have ingested was 43 micrograms of radium sulphate for each working day. This figure is doubtless much too large. The plaintiff has incorporated the following chart in his brief and

accepts the figures used in the third column for his purposes:

The decedent died June 16, 1931. Dr. Martland performed an autopsy and con-

| Material Used. | Radium Ingested per Week. | Radium Ingested in 1½ Yrs. | Radium Constantly in Alimentary Tract. |
|---|---|---|---|
| 8⅓ ug. ra. per gram<br>40 grams a week<br>⅓ gram ingested out of every 10 gr. used | 16⅔ ug. | 1300 ug. | 46 ug. |
| 33⅓ ug. per gr.<br>40 grams a week<br>⅓ gr. ingested out of every 10 | 66⅔ ug. | 5200 ug. | 184 ug. |
| averaging 8⅓ to 33⅓ ug. per gram<br>40 gr. a week<br>⅓ gr. ingested out of every 10 | 41⅔ ug. | 3250 ug. | 115 ug. |

The evidence shows that the decedent was in good health at the time she left the employ of the defendant. In April, 1921, the decedent was married to the plaintiff. Her health remained excellent up until the autumn of 1927.

In the latter part of 1927 the decedent complained of a fear that she might have radium poisoning. She delayed visiting her dentist for some time because other persons who had radium poisoning had demonstrated symptoms similar to those from which she suffered. The decedent constantly associated with those persons who were suffering from the radium poisoning and frequently discussed its danger and symptoms with them, her husband, and sister.

In the spring of 1928, the decedent had a tooth extracted that troubled her. She told her dentist that she had hesitated to go to him for fear that she might have radium necrosis. Her dentist reassured her, and for the time being she appeared to be in good health.

From the latter half of 1928 to October 1930, she was treated by a doctor and she complained continually of pains in her face and jaw and frequently discussed radium poisoning. She was convinced that she was a victim. In October, 1930, she began to have pains in her legs and joints. Dr. Harrison S. Martland, the chief medical examiner of Essex county, N. J., determined that the decedent was a victim of radium necrosis on October 15, 1930. At that time Dr. Martland read X-rays taken of the decedent's jaws in 1925 as showing typical areas of radiation osteitis.

On May 4, 1931, she first presented a claim for damages to the defendant.

firmed his diagnosis that the decedent had died of occupational radium poisoning (osteogenic-sarcoma of pelvis) in the watch-dial industry. Dr. Martland found radium deposited in the bone structure of the decedent.

Plaintiff, husband of the decedent, individually, as general administrator, and as administrator ad prosequendum, commenced an action at law for her injuries and death on May 17, 1932. In its answer to the complaint at law, the defendant pleaded various provisions of the New Jersey statute of limitations, among other defenses.

On January 10, 1933, the plaintiff instituted this suit in equity to enjoin the defendant from setting up the statute of limitations as a defense to the plaintiff's action at law.

Nothing like a fair analysis of the evidence relating to the development of radium therapeutically and industrially can be given here. The legal issues will be decided on the basis of the evidence offered by the plaintiff, and only a brief allusion can be made to the details of the cases presented in such a thoroughgoing manner by both parties.

There is no question but that dial painters, at the time the decedent worked in the defendant's factory, ingested radium sulphate contained in the paint, with which they worked, by pointing the brushes with their lips, and that they breathed and swallowed radium sulphate contained in the dust in the air of their workroom, and radium emanation present in the workroom. The dial painters were protected by neither special methods or devices nor scientific ventilation.

Doubtless, the insoluble radium sulphate was absorbed in part after ingestion; some of it must have reached the blood stream and eventually been deposited in the bones of its victim. At the same time a dial painter would have constantly been subject to radium emanation and radium A. It suffices that the autopsy of the decedent revealed that radium was present in the decedent's bones after her death in 1931. The amount of radium to which the systems of dial workers were subjected must have been fairly constant, and added to that it appears that its effect would be cumulative.

But there is no reason to consider those factors now. It has only been established since 1924 or 1925 that the conditions under which the dial painters worked in 1917 and thereabouts subjected them to a pernicious and frightful occupational hazard. The important factual question is to determine how much the scientific and medical world and the defendant knew about the industry at the time, or thereabouts, that the decedent's alleged cause of action arose.

Even to-day the problems concerning radium have hardly been touched. A decade and more ago theories presently accepted were in a stage of controversial experimentation or unknown. In the plaintiff's brief there are listed some twenty-five alleged admissions made by the defendant's experts in the course of their testimony to the effect that in 1917 radium was known to be dangerous; that it was possessed of tremendous energy; that its very use, medically, was experimental; and that there were divers other recognized and unrecognized reasons in the light of the knowledge of that time to destroy the defendant's case. Many of those "admissions," much of the plaintiff's evidence and innumerable of plaintiff's assertions are unquestionably true. The great difficulty is that no one was talking about the use of radium under the circumstances here.

Of course, it was recognized in 1917 and many years before that radium was the most active of the elements and possessed an incomprehensible store of energy.[1]

Several writers, one as early as 1913, suggested that radium salts which were not eliminated from the body would eventually be deposited in the bone structure and there replace the calcium and actually become a part of the structure in the form of radium sulphate.[2] This was theory and there were no computations at that time

---

[1] Madame Curie, "Radioactive Substances" (1904).

Lord Rutherford likewise made this clear in his book, "Radioactivity," published in 1905 (Exhibit P–25), and also in his book, "Radioactive Substances and their Radiation," published in 1913 (Exhibit P–23), pointing out that radium was known to be a substance which was undergoing spontaneous self-transformation. In other words, the breaking up of atoms of radium discharged a gas known as "radium emanation." This gas in turn decayed and deposited a solid product known as "radium A." This in turn decayed and left a solid known as "radium B," and so on down through "radium F," which decayed and deposited lead. Radium itself was known to have a half life of 2,000 years; that is to say, it would be reduced to half its activity in 2,000 years. What activity then remained would take another 2,000 years to reduce 50 per cent., and so on. Radium emanation was known to have a half life of 3.85 days and a practical life of about 20 days, although after 90 days approximately 1 per cent. of the emanation would still remain in existence. Radium A to F, inclusive, were known as the "active deposit." Their periods of half life appear on the chart which is Exhibit P–24, a copy of which is attached hereto, and marked "Appendix I."

These various products gave off radiations. Radium, radium emanation, radium A, and radium F gave off alpha particles. Radium itself was known to give off 34,000,000,000 per second per gram. In equilibrium with its decay products almost five times this number of alpha particles were given off per second. Exhibit P–23, p. 132. These particles were known to have mass and to be approximately 7,000 times the size of an electron. They were likewise known to be positively charged. The speed with which they were shot out from the parent radioactive atoms was between 12,-000 and 18,000 miles per second, and they were shot out in a constant stream.

[2] Seil, Viol and Gordon, "Elimination of Soluble Radium Salts, Taken Intraveneously and Per Os" (May 1, 1915), New York Medical Journal, p. 896, Exhibit P–34; Dominici and La Bordes, "Study on Injection of Radium Salts" (1913), Comptes Rendeus Des Seances De L'Academie Des Sciences, 156, 1107–1109, Exhibit P–12; and "Concerning Fixation by the Skeleton of Radium Injected in the Soluble State" (1913), Seances Et Memoirs De La Societe De Biologie, 75; 108–110, Exhibit P–13.

to indicate what percentage of a given amount of the soluble or insoluble salt taken internally would eventually reach the bone.

There is evidence in the literature that radioactive salts introduced in the body would be eliminated in part very slowly.[3] Assuming that was established, it might be a fair inference, but surely not conclusive, that radium given in frequent doses was cumulative in its nature and effect.

The evidence shows that in 1917 many dangers to the human body from radium and radium emanation were recognized. Long exposure to emanation, irradiation, and X-rays had resulted, among a few technicians and scientific men, in fatal or dangerous injuries.[4] An article published in 1914 was entitled "Concerning Occupational Injuries Due to Radioactive Substances,"[5] and another, "Occupational Diseases Due to Radium; Report of Cases."[6] Those articles were principally concerned with external burns of the skin.

Furthermore, prior to 1917, the indications from radium were contrary to using it for treatment in a number of diseases.[7] It was fairly established that burns might show late effects in the form of general disturbances or skin changes resulting in cancer.[8] The plaintiff said correctly in his brief that in 1917 "no one had re-examined an individual who years before had been treated by radium salts administered internally, and found evidence of late injurious effect." But it is difficult to understand how the defendant can be said to have perpetrated a fraud when it, a commercial enterprise, failed to draw inferences, which no doctor had ventured, to the effect that its industry was suicidal to its workers. It was a theory that radium would be deposited in the bones and there were proven cases of burns by X-ray and direct contact causing delayed external effects, but that does not lead to the conclusion that dial painters were doomed or even in danger as of the knowledge of 1920.

On the contrary, in the early literature, numerous statements were made as to the beneficial effect of radium applied internally. Some of the articles to that effect are listed below.[9]

Plaintiff argues that the administration of radium by prescription under the supervision of physicians was not to be compared with the exposure by ingestion, in-

3 Dominici and the La Bordes, supra, note 2.

4 Mesernitzky, St. Petersburg-Kreuznoch, "Concerning Injury to the System Through Large Doses of Radium Emanation" (1914), publication not given, Exhibit P-6; "Contribution on the Biological and Pathological Action of Soluble Radium Salts—With Special Reference to its Therapeutic Value in Pernicious Anaemia and Leukemia" (1914), Radium, vol. III, No. 5, p. 65, Exhibit P-21A; Part II of same article, vol. III, No. 6, p. 85, Exhibit P-21B; Rolleston, "The Harmful Effects of Irradiation" (1930), The Quarterly Journal of Medicine, No. 93, p. 101, Exhibit P-49.

5 Gutzendt and Halberstaedter—Deutsche-Medizinische Wochenschrift, March 26, 1914, p. 633, Exhibit P-9.

6 Ordway, The Journal of American Medical Association, vol. LXVI, No. 1, p. 1, 1916, Exhibit P-26.

7 Mesernitzky, supra, note 4; Cameron and Viol, "Classification of Various Methods Employed in the Internal Administration of Radium Emanation and Radium Salts," 1915, Radium, vol. IV, No. 4, p. 57, Exhibit D-18.

8 Gutzendt and Halberstaedter, supra, note 5; Rolleston, supra; note 4; Rutherford, "Radioactive Substances and Their Radiations," 1913, Exhibit P-23.

9 Proescher, "The Intravenous Injection of Soluble Radium Salts," 1914, Radium. vol. II, No. 4, p. 45, Exhibit D-26; vol. II, No. 6, p. 77, Exhibit D-28.

Bissell, "The Intravenous Injection of Radium Element," November, 1914, Pennsylvania Medical Journal, p. 129, Exhibit D-29.

Cameron and Viol, "Classification of the Various Methods Employed in the Internal Administration of Radium Emanation and Salts," 1915, Radium, vol. IV, No. 4, p. 57, Exhibit D-18.

Delano, "A Study in the Internal Therapeutics of Radium," July 24, 1915, Medical Record, p. 137, Exhibit D-32.

Bissell, "Radium Therapeutics Otherwise Than For Malignancy," June, 1915, Medical Record, p. 1023, Exhibit D-30.

Proescher, "Contribution on the Therapeutic Value of the Intravenous Injection of Soluble Radium Salts in the Treatment of Pernicious Anaemia and Leukaemia," 1916, Radium, vol. VII, No. 3, p. 71, Exhibit D-27A, vol. VII, No. r, p. 102, Exhibit D-27.

Park, "Chronic Interstitial Nephritis," July 8, 1916, New York Medical Journal, p. 66, Exhibit D-30A.

Sterns, "Radium and Radium Salts," 1920, American Journal of Electrotherapeutics and Radiology, p. 169, Exhibit D-22.

268

halation, etc., suffered by the workers. This is undoubtedly true, but plaintiff seeks to charge that defendant should have known of the great danger from the literature of that time. A great deal of the literature, as heretofore stated, described the advantages and benefits to be derived from the administration of radium, the existence of which furnished an indubitably disarming influence as to the dangers attendant to its effect.

It was true in 1917, as the plaintiff states, that radium had been known to have a fatal effect on human beings; that medical and scientific men would prefer to experiment on animals rather than persons to determine its effects under different conditions; that it was not used in treatment of certain diseases because of contraindications; that the dial painters were ingesting radium and its emanations under conditions far different from its medical use; that the dial workers would have been partly protected by certain devices and changed working conditions; that some literature may have suggested the chance of hazard in the occupation and the requirement for constant or frequent medical surveillance; that there were less dangerous methods of dial painting in use in Europe which could have been adopted; and that there were no experiments conducted or being conducted in 1917, or prior thereto, to determine the effect of dial painting.

What has been said as to the evidence before the court may not be accurate from an expert's viewpoint. It was not so intended. The object of the narrative was to present the situation in the best light for the plaintiff, since the court is of the opinion that relief must be denied to the plaintiff on his own statement of facts. Indeed, it is doubtful if an accurate picture of the knowledge existing in 1920 concerning radium could be drawn even by experts. The learning of that time was so colored with conjecture and theory, some of which has since been discarded, that it is impossible impartially and reliably to rationalize it.

There is no question but that defendant was utterly ignorant of the harmful effects attendant upon its factory process until 1924, when its attention was directed to an alleged case of radium necrosis suffered by one of its former employees.

It had examinations made of several of its employees of longest standing and re-quested an investigation into the situation by the Life Extension Institute of New York. That agency reported on March 11, 1924, that no evidence was disclosed of the influence of any particular metallic poisoning and that the cases, in so far as they went, showed the ordinary range of human troubles and did not reflect any specific occupational influence. (Letter of Dr. Fisk, to H. B. Viedt, vice president, U. S. Radium Corporation, Exhibit D–3.)

On March 12, 1924, it retained Dr. Cecil K. Drinker of the School of Public Health, Harvard University, to conduct an investigation of the cause of necrosis occurring in reported cases. His report concludes that the necrosis was probably caused by exposure to radium, but as to how this could have occurred he was unable to demonstrate then. The report is contained in Exhibit P–31–7 and the substance of the same was received for publication on May 25, 1925, by and actually published in the Journal of Industrial Hygiene of August, 1925, vol. VII, No. 8, p. 371, Exhibit D–7.

Following investigations and reports made by Dr. Blum, a dentist, and Dr. Hoffman, a statistician, in 1924, Dr. Harrison S. Martland, in 1925, published his first article on the subject, which he entitled, "Some Unrecognized Dangers in the Use and Handling of Radioactive Substances," Journal of American Medical Association, vol. 85, p. 1769, December 5, 1925, Exhibit D–1. It is undisputed that he established the occupational hazard in the dial-painting industry.

The defendant instigated the investigations and evidenced a willingness to cooperate in them, demonstrating its effort to determine the cause of the harmful effect upon its workers as soon as its attention was directed thereto, and there is no suspicion upon which the court may rest to charge it with having knowledge of such cause or that it should, prior to 1924, have had such knowledge.

There is no better way to illustrate that conclusion than to turn briefly to the defendant's case.

The defendant contends that up until the year 1924 it did not know and cannot be charged with the knowledge that it was dangerous for the dial painters to ingest the possible maximum amount of radium in the paint into their systems in the course of their work.

Its contention is based on the assumption that the decedent might have ingested 43 micrograms of radium sulphate daily for 5½ days a week for a period of a year and a half. That amount is a considerably larger figure than that on which the plaintiff insists. The defendant suggests it because Dr. Martland once stated that this was the maximum amount according to his estimate.

As a mater of fact, it is evident that a far smaller quantity was taken into the system. Each worker painted 24 dials, each dial having 14 figures, with a gram or less of paint. There are 28.54 grams in an ounce and the several grades of paint used contained 1 part of radium to 30,000 to 120,000 parts of zinc sulphide. A great number of considerations enter into any approximation of the amount of paint ingested, and all of them tend to lessen the amount suggested by the defendant or calculated by the plaintiff.

Dr. Lind testified that in his opinion of 1920 no harmful effects were to be expected from dial painting under the circumstances and the length of time that the decedent worked. He further testified that the literature of that time had nothing in it to lead to a contrary conclusion. Dr. Lind's opinion was corroborated at the trial by the testimony of Dr. Schlunt, Dr. Flinn, Dr. Failla, and Dr. Pohle.

Both Dr. Lind and Dr. Schlunt participated in the government's project to recover radium in Colorado, and as physicists stand out in the field. Dr. Lind exposed himself, without anticipating danger to as much as 440 milligrams of radium at one time, and in a period of four years he supervised the handling of 8½ grams of radium. Despite the attack made by plaintiff against him because he could qualify only as a physicist and not as an expert

medical man, consideration of the evidence in this case makes it increasingly obvious that the considerable portion of the working knowledge and experimentation in the radium field was that of physicists and not of physicians.

The corroborating testimony mentioned came from very respectable authorities.

The Office of Industrial Hygiene and Sanitation, United States Public Health Service, stated in an article published in 1933.[10] the following: "Painting watch and clock dials with a luminous paint containing a radioactive substance began in this country in 1915. During the world war and immediately after, this small industry was at its peak, and since the industry began several thousand workers in all have been employed. Only within the last decade had poisoning by radium been recognized. Martland in 1929 reported 40 cases of radium poisoning among workers and former workers in this industry or in closely allied occupations."

It is admitted that Dr. Martland first established the danger in the dial-painting industry in 1924 or 1925. Prior to 1924, it had not been suspected, and Dr. Lind, whose creditability is not to be questioned, was unable to conclude that Dr. Martland was right until 1929.

Dr. May, who was the only expert witness for the plaintiff, testified that prior to 1924 there was nothing in the literature indicating danger from dial painting or to show that harm would result from the use of radium under those circumstances. He stated that he agreed with an article published in 1926 by Dr. Flinn [11] that the conclusion that no industrial hazard existed in the dial-painting industry was justified as of that time. He later stated he disagreed. But he accepted Dr. Martland's

[10] "Health Aspects of Radium Dial Painting," 1933, The Journal of Industrial Hygiene, vol. XV, Nos. 5 and 6, Exhibit P-53. This series of articles contained the findings and recommendations resulting from an investigation of the United States Public Health Service into the hazards which existed in this industry, which investigation was undertaken in collaboration with an advisory committee consisting of Dr. L. F. Curtiss, Physicist, United States Bureau of Standards, Washington, D. C.; Prof. William Duane, Professor of Bio-physics, Harvard University; Dr. Gioacchino Failla, Physicist, Memorial Hospital, New York City; Dr. O. H. Gish, Chief, Section of Terrestrial Electricity, Department of Terrestrial Magnetism, Carnegie Institution of Washington; Prof. S. C. Lind, Director, School of Chemistry, University of Minnesota; Dr. Harrison S. Martland, Chief Medical Examiner, Essex County, New Jersey; Prof. Herman Schlundt, Professor of Physical Chemistry, University of Missouri.

[11] Flinn, "Radioactive Material An Industrial Hazard?" 1926, Journal of American Medical Association, vol. 87, No. 25, p. 2078, Exhibit P-39.

articles [12] of 1925 and 1926 as true. He further agreed with the conclusion of Dr. Field as of 1920 that small quantities of radium given internally had no toxic effect.

In 1912, an article by Dr. E. Bellingham Smith [13] stated: " * * * Soluble salts of radium are rapidly eliminated, however administered. The insoluble salts per os are excreted directly by the bowel, and there is no evidence of any temporary absorption and circulation."

Dr. May disagreed with the conclusion that insoluble radium salts administered per os are excreted completely. He thought that as of 1912 some of the insoluble salt might be absorbed. But there is no literature prior to 1920 that supports his opinion as to insoluble salts, and the opinions of Dr. Schlundt and Dr. Lind to that effect are contrary.

Radium sulphate is one hundred times less soluble than barium sulphate. The barium salt is so insoluble that it is introduced in the intestinal tract so that it may be examined by X-ray. Up to 1925, the literature did not show that radium sulphate would remain in the body. Although there had been suggestions to the contrary, it was accepted that the insoluble salt when taken by mouth would pass directly through the intestinal tract and from the body in a short period of time. Radium was administered by some doctors in the form of a bromide, on the theory that it would remain in the body longer.

It must be remembered that in considering all of the evidence prior to 1924, none of it is remotely concerned with the dial-painting industry, but with the knowledge and experiments of the scientific and medical world.

There is no way to illustrate more emphatically what the experts in radium thought of the dial-painting industry than to recall that even after Dr. Martland's findings in 1925, Dr. Lind, Dr. Flinn, Dr. Schlundt, and Dr. Pohle disagreed with him, although they all eventually came to agree with him.

It is apparent from the literature produced during this trial that prior to 1925, although there was some suggestion of hazard through the agency of radium, many hailed it as a great boon to humanity, and its internal uses by injection, inhalation, etc., were frequently advocated. That the articles by Hoffman followed by that of Martland, Conlon, and Knef in the Journal of the American Medical Association, published respectively in September and December of 1925, startled the medical world, is demonstrated in the language of Lacassagne in his article entitled, "A New Professional Accident Among Handlers of Radioactive Materials; Necrosis of the Maxillaries." [14] He says: "Two recent articles (1), appearing in the Journal of the American Medical Association, have revealed *an unforseen and surprising new accident,* which has affected an important proportion of workers occupied in painting with luminous radioactive products; it is a question of maxillary necrosis, always serious, and often ending in death." He concludes: "This persistence explains the serious lesions of blood forming organs which can appear some years after the introduction of the radioelement in the body, and ends in fatal pernicious anemia. *The knowledge of these facts imposes on physicians the greatest care in the practice of injections of longlived radioactive materials.*"

(Italicizing in both paragraphs mine.)

Again in 1927, Allen, Bowing, and Rowntree [15] commented upon the evolution of thought on the use of radium, as follows: "Fifteen years ago the literature was flooded with the optimistic reports on the use of radium in medicine. These reports ceased rather abruptly, and during the last ten years little has been written on the subject, except by those directly or indirectly concerned commercially. During the intervening years radium has been em-

---

[12] Martland, "Some Unrecognized Dangers in the Use and Handling of Radioactive Substances," Journal of American Medical Association, vol. 85, p. 1769, Dec. 5, 1925, Exhibit D–1.

Martland, "Microscopic Changes of Certain Anemias Due to Radioactivity," 1926, Archives of Pathology, vol. 2, No. 4, p. 465, Exhibit D–6.

[13] "Distribution and Excretion of Radium and its Emanation After Internal Administration," Quarterly Journal of Medicine, 1912, p. 249, Exhibit D–10.

[14] Published in the Paris Medical, February 6, 1926, pp. 132–134, Exhibit P–14.

[15] "The Use of Radium in Internal Medicine" January 15, 1927, The Journal of the American Medical Association, vol. 88, No. 3, p. 164, Exhibit D–25.

ployed sporadically in the treatment of various diseases, particularly arthritis, neuritis and hypertension, and more recently thrombo-angiitis obliterans (Buerger's disease). Although striking results have been observed on rare occasions in cases of hypertension and arthritis following the use of radium by the so-called sipping cure, the method has dropped into complete disuse and has been replaced by a more certain procedure, the intravenous administration of the soluble salts of radium. However, in most cases, even with this method results have been meagre, transient or entirely negative. Radium treatment is now rarely employed in our wards, in spite of the fact that it always can be had on request."

In a paper published in 1932, by Dr. Martland, entitled "The Danger of Increasing the Normal Radio-activity of the Human Body," [16] he says:

"It is the purpose of this paper to summarize my findings and views and leave the reader with the facts, that undue or professional exposure to radium and other long-lived radioactive substances is dangerous and should be reduced to a minimum, and that the therapeutic use of these substances by internal administration, either by way of the mouth, or by inhalation, or by intravenous or intramuscular injection may be highly dangerous and is not warranted in any medical condition, as none of the known radioactive substances produce any curative results.

"It should be emphasized, that the disastrous results cited in this paper are not to be confused with the legitimate use of external irradiation by means of the X-rays and radium, such as is used for the treatment of malignancy in hospitals and institutions specializing in and competent to handle such treatments. The deleterious effects and hazards of external, penetrative, non-accumulative irradiation are well recognized and have been reduced to a minimum by proper technic."

He concludes:

"Since there is no evidence indicating any beneficial results from the drinking of waters containing emanation, except phsycic ones, and there is scientific evidence that radon is not free from danger, their use should be forbidden. The human race will not suffer if they are eliminated. * * *

"It would appear that the intravenous injection of long-lived radio-active elements, or the internal administration of radium, mesothorium, or radiothorium, is highly dangerous on account of the late harmful effects. As previously stated, and here repeated for emphasis, it is not warranted in any medical condition, as none of the known radioactive substances produce any specific or curative result."

These, then, were red flags of warning to the medical profession. They appear subsequent to the year 1925. But if the defendant is to be denied the protection of the statute of limitations, the plaintiff's case must be based upon the proposition that the defendant should have known of the harmful effects during the period from 1917 to 1920.

■ If it is assumed that a cause of action existed in this case in favor of the decedent against the defendant, it must have accrued some time in the course of her employment in 1917, 1918, or 1920, at the latest, when she was last exposed to the radium. It is unnecessary, if not impossible, to determine the exact date. The question has not been raised, but, at any rate, if the action arose on the last day of her employment, the statute would have normally barred her remedy some time in 1922, which is at least two years before radium necrosis was discovered and over seven years before she was diagnosed.

It appears, from a careful consideration of all the evidence, that no one had considered the effect of the radium substances on the workers in this comparatively small and commercially unimportant occupation. There was much conflicting opinion in the minds of the few experts and little settled knowledge. Some experts in 1920 considered small quantities of radium such as the painters ingested beneficial to the human system. There is apparently no express statement to the contrary.

It is tempting in the light of the knowledge of to-day and the experience since 1920 to create the thought that the defendant must have been negligent in some way. To-day, industrial methods which the defendant then employed would not be merely negligent but criminal. But it should be carefully noted that this case must be decided on the facts as they existed in the light of the knowledge of 1917 to 1920.

16 Emanuel Libman Anniversary Volume, 1932, International Press, New York, Exhibit P-33.

Were safety measures such as scientific ventilation, masks, periodical medical examinations, abolition of brush pointing, and other now known precautions to be considered necessary as of 1920?

Actually, the defendant and its research bureau failed to anticipate what later research and scientific investigation proved to be a fact, namely, that the defendant's dial painters in 1920 were exposed to the gravest of dangers in their occupation.

The fact is that this experience was not brought home to science and medicine until a considerable number of cases such as that at bar had been considered and then the knowledge came slowly, only to be accepted as fact several years after the first necrosis cases were exposed.

Notwithstanding the fact that the court is convinced that the plaintiff is not entitled to the relief he seeks on the ground of undisclosed fraud, the seriousness of the consequences of the decision makes it desirable to review briefly the New Jersey authorities defining the limits of the so-called doctrine of fraudulent concealment.

The New Jersey statute of limitations which is applicable to tort actions provides: "All actions hereafter accruing for injuries to persons caused by the wrongful act, neglect or default of any * * * corporation or corporations within this state, shall be commenced and instituted within two years next after the cause of such action shall have accrued and not after." Rev. 1877, p. 594, as amended P.L. 1896, p. 119, 3 Comp.St. 1910, p. 3164, § 3.

■ This is the genuine and orthodox statute which was taken from 21 James I, c. 16. In an action at law, the plea of the statute, regardless of fraud on the part of the tort-feasor, is always a bar to recovery. The New Jersey courts have held that the Legislature did not intend that there should be any exceptions to the statute other than those expressly enacted in other sections. Moreover, it appears that in the later English statute of 3 and 4 Wm. IV, c. 27, a clause in section 26 expressly saves the remedy under that statute from the bar of concealed fraud.

In Thorpe v. Corwin, 20 N.J.Law, 311, 317, the court said: "The statute of limitations makes the lapse of time a positive and legal bar. When once it has begun to run against a person under no legal disability, it pursues its course uninterrupted by any subsequent events; and when the period prescribed by the statute has elapsed, the bar is complete, and its force can neither be strengthened nor impaired by anything that has happened in the meantime. * * * The statute leaves nothing for presumption. Time alone settles the rights of the parties, by the giant force of the statute."

That is law to-day in New Jersey. Freeman v. Conover, 95 N.J.Law, 89, 112 A. 324; contra, Crawford v. Winterbottom, 88 N.J.Law, 588, 96 A. 497.

■ In our system of jurisprudence, equity, in the case of fraud, has never barred relief to an injured party who has been in ignorance of the fraud. Prevost v. Gratz, 6 Wheat. 481, 5 L.Ed. 311; Badger v. Badger, 2 Wall. (69 U.S.) 87, 17 L.Ed. 836; Bailey v. Glover, 21 Wall. (88 U.S.) 342, 349, 22 L.Ed. 636; Exploration Company v. United States, 247 U.S. 435, 38 S. Ct. 571, 62 L.Ed. 1200; Howard v. West Jersey & S. S. Railroad Company, 102 N. J.Eq. 517, 141 A. 755.

In Bailey v. Glover, supra, the court said in giving its reasons for the equitable doctrine: "They [statutes of limitation] were enacted to prevent frauds; to prevent parties from asserting rights after the lapse of time had destroyed or impaired the evidence which would show that such rights never existed, or had been satisfied, transferred, or extinguished, if they ever did exist. To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure." Cited in Exploration Company v. United States, 247 U.S. 435, at page 447, 38 S.Ct. 571, 62 L. Ed. 1200.

Vice Chancellor Leaming in the West Jersey Railroad Company Case, supra, explained that the statute is for the benefit of the individual and not to secure general objects of policy; so, therefore, its benefits may be lost by conduct invoking the principles of estoppel in pais, as well as is familiarly known, by waiver.

■ In New Jersey, a person who has been wronged by fraud is relieved from the bar of the statute of limitations at law by a unique method. The plaintiff goes into the Court of Chancery and enjoins the plea of the statute at law.

The phase of the doctrine with which this case is concerned, "fraudulent concealment," of a cause of action, is established on a broad basis in this state.

██ It is not necessary that the acts or conduct constituting the concealment of a cause of action be such as would be required to make out fraud in a law court.

The test is defined as follows: "Also it should be noted that, while the doctrine of estoppel in pais rests upon the ground of fraud, it is not essential that the representations or conduct giving rise to its application should be fraudulent in the strictly legal significance of that term, or with intent to mislead or deceive; the test appears to be whether in all the circumstances of the case conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct; whether the author of a proximate cause may justly repudiate its natural and reasonably anticipated effect; fraud, in the sense of a court of equity, properly including all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another. 1 Story Eq.Jur. § 187. The authorities in this state to the general effect stated are Lamb v. Martin, 43 N.J.Eq. 34, 37 [9 A. 747]; Martin v. State Insurance Co., 44 N.J.Law 485, 487, 43 Am.Rep. 397; Holloway v. Appelget, 55 N.J.Eq. 583, 585, 40 A. 27, 62 Am.St.Rep. 827; Clark v. Augustine, 62 N.J.Eq. 689, 695, 51 A. 68; Freeman v. Conover, 95 N.J.Law, 89, 93, 112 A. 324. See, also, Magner v. Mutual Life Association, 17 App.Div. 13, 44 N.Y. S. 862, affirmed 162 N.Y. 657, 57 N.E. 1116; Thompson v. Phenix Insurance Co., 136 U.S. 287, 300, 10 S.Ct. 1019, 34 L.Ed. 408." Howard v. West Jersey, etc., R. Co., 102 N.J.Eq. 517, 521, 141 A. 755, 757, supra.

That statement was recently approved by the Court of Errors and Appeals in Patrick v. Groves, 115 N.J.Eq. 208, 169 A. 701. It suggests a much wider scope to the doctrine of "fraudulent concealment" than is generally accepted elsewhere. See Dawson, Fraudulent Concealment and the Statute of Limitations, 31 Mich.L.R. 591; note, Fraudulent Concealment of a Right of Action and the Statute of Limitations, 43 Harv.L.R. 471; Wood v. Carpenter, 101 U.S. 135, 25 L.Ed. 807.

In Lincoln v. Judd, 49 N.J.Eq. 387, 24 A. 318, 319, the complainant shipped sheep to the defendants, who sold them and remitted the proceeds of the sales, less their commissions and amounts purported to have been expended for freightage. The freightage deducted was grossly in excess of the actual charges, but the complainants accepted the moneys as correct, relying on the defendant's honesty, and did not discover the fraud presumably for over six years. The defendants demurred to the bill for an accounting on the grounds that the complainant had an adequate remedy at law and that more than six years had elapsed since the cause accrued. But the court overruled the demurrer, holding that "in cases of fraud, the time limited within which the action must be brought will not commence to run until the discovery of the fraud, or until the complainant was in a situation where, by the exercise of reasonable diligence, he would have discovered the fraud."

Another case, Holloway v. Appelget, 55 N.J.Eq. 583, 40 A. 27, 62 Am.St.Rep. 827, held that the defense of the statute in an action at law would be enjoined in equity where a defendant sold certain municipal bonds after making an agreement with an attorney to pay him a percentage for collecting the bonds and allowed the statute to run without informing the attorney of the fact. See comment, 12 Harv. L.R. 220.

The court held in Clark v. Augustine, 62 N.J.Eq. 689, 51 A. 68, that nonresident executors would be enjoined in equity from setting up the bar of the statute to an action at law on a claim against the estate when the executors gave notice that the claim had been rejected and then remained out of the state until the period for instituting suit had expired. The court said in disposing of the case (62 N.J.Eq. 689, at pages 694 and 695, 51 A. 68, 70): "In large numbers of cases where the defendant has caused the plaintiff to subject his claim to the statutory bar by procuring an injunction upon its prosecution, or by fraudulently concealing its existence, or by apparently waiving, by a promise or otherwise, the benefits of the statute as a defense, courts of equity have restrained the defendant from pleading the statute, on the ground that he had estopped himself, or that to permit him to interpose such a plea would be to allow him to take advantage of his own wrong. Doughty v. Doughty (1855) 10 N.J.Eq. [2 Stock.] 347;

Cowart v. Perrine (1870) 21 N.J.Eq. [6 C.E.Gr.] 101; Quick v. Corlies [39 N.J. Law, 11], supra; Freeholders of Somerset County v. Veghte (1882) 44 N.J.Law [15 Vr.] 509; Lamb v. Martin (1887) 43 N.J. Eq. [16 Stew.Eq. (34)] 36, 9 A. 747; Holloway v. Appelget (1896) 55 N.J.Eq. [10 Dick.Ch.Rep.] 583, 40 A. 27, 62 Am.St. Rep. 827; 19 Am. & Eng. Encycl.L. (2d Ed.) 243, 286, 288, and cases cited."

Howard v. West Jersey Railroad Company, supra, one of New Jersey's leading cases, furnishes an excellent illustration of the breadth of the doctrine. There, the plaintiff and the defendant had been negotiating a settlement of the plaintiff's claim for damages for personal injuries. The defendant apparently admitted liability, but the amount of damages was in question. The court appears to have been of the opinion that the plaintiff believed, by reason of the statements and conduct of the defendant, that the amount of damages would be determined when the extent of the injuries had been determined. He asked for $10,000 in settlement of the claim. This was taken under advisement, and the plaintiff awaited a reply. Two days prior to the end of the statutory period, of which the plaintiff did not know, the defendant offered $2,500 in settlement. After discussing the facts of the case, the court said:

"While it cannot be said to be ordinarily any part of duty to apprise an adversary of his rights, it must be recognized that one cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought. This is recognized by our federal Supreme Court as a rule of justice in the concluding sentence of the opinion of the court in Thompson v. Phenix Insurance Co., supra, and is made the basis of decision in Magner v. Mutual Life Association, supra.

"Any suggestion of want of authority of Mr. MacDonald and Mr. Turnbull to bind defendants by their conduct is untenable. Admittedly both were acting within the field of their employment. Defendants cannot avail themselves of the fruits of their activities and at the same time escape responsibility for the methods employed by them."

In Patrick v. Groves, 115 N.J.Eq. 208, 169 A. 701, the defendant, who had been an attorney for the plaintiff, misappropriated his clients' money. In affirming the decree of the Court of Chancery enjoining a plea of the statute to an action at law to recover the misappropriated money, the Court of Errors and Appeals held that the defendant's fraudulent conduct was responsible for the plaintiff's delay in prosecuting their action and that he was estopped thereby to set up the statute. The court approved the statement of the doctrine of estoppel in pais in the West Jersey Railroad Case, supra.

Generally, ignorance of the existence of a cause of action is required on the part of the plaintiff. The lack of knowledge of evidence or the identity of the defendant is not sufficient to invoke the doctrine of fraudulent concealment. But in Noel v. Teffeau, 116 N.J.Eq. 446, 174 A. 145, a "hit and run" driver of an automobile was restrained by the Court of Chancery from setting up the defense of the statute to an action brought by the person whom he had injured. This decision was influenced by a statute of New Jersey making it the duty of persons involved in accidents to report such occurrences to proper authorities.

Under the orthodox doctrine of fraudulent concealment, it is required that the plaintiff be in ignorance of the existence of the cause of action and that the defendant must intend to keep the plaintiff in ignorance thereof. Silence is not enough to make out fraudulent concealment.

It is accepted in New Jersey that the plaintiff must show reasonable diligence in bringing his suit after the estoppel has expired. See cases, infra. And it makes no difference if the concealment (or fraud) springs from the same act as the cause of action or is found in subsequent acts (or failure to act).

Thus, it was said in Holloway v. Appelget, supra, 55 N.J.Eq. 583, at page 585, 40 A. 27, 28, 62 Am.St.Rep. 827:

"The question is whether, in equity, Mr. Holloway is entitled to invoke the statute of limitations in bar of Appelget's action at law. In most of the cases the bar has been set up in suits in equity instituted for the purposes of obtaining relief in instances of fraud. There, however, is no reason why a court of equity should not, by the use of its injunctive power, dis-

arm a defendant from using the statute fraudulently in an action at law. In the case of Freeholders of Somerset County v. Veghte, 44 N.J.Law [15 Vr.] 509, where it was held that a fraudulent concealment of a cause of action was no answer to the statute in an action at law, it was admitted that relief could be successfully sought in equity.

"It also appears that the equitable relief here invoked has been granted mostly in cases where the act out of which the cause of action arose was a fraudulent act, in its nature self-concealing, such as embezzlements or thefts carried out by the falsification of accounts or vouchers. But it seems clear that a court of equity will interfere, although the cause of action may not have arisen out of a technically fraudulent act, if the defendant has employed any means to mislead the plaintiff, or to hide from him the fact that a cause of action has arisen."

But of course, there must be some sort of conduct or acts which are fraudulent or unconscionable. Mere negligence will not constitute equitable fraud even if the plaintiff has no knowledge of the cause of action.

There are apparently no New Jersey cases holding to that effect, but the rule has no exceptions in any jurisdiction except in the so-called inadvertent trespass cases, such as Lewey v. H. C. Fricke Coke Company, 166 Pa. 536, 31 A. 261, 28 L.R.A. 283, 45 Am.St.Rep. 684.

As heretofore indicated, there is no orthodox doctrine of "fraudulent concealment" in New Jersey. That is due doubtless to the flourishing Court of Chancery, which is maintained apart from and independently of the law courts. At any rate, the plaintiff will not be relieved of the bar of the statute unless the defendant by his equitable fraud has prevented him from commencing his cause of action. The test of equitable fraud is stated in Patrick v. Groves and the West Jersey Railroad Case, both supra.

In this case, the plaintiff contends that the testimony tends to show:

"1. An omission which involves a breach of legal duty.

"2. An omission which involves a breach of confidence justly reposed (found in the fact that as a matter of *law* the servant is entitled to assume that his master has exercised due care to fulfill the obligations imposed upon him by law, Leuteritz v. Ice Consumers' Co., supra [82 N.J.Law, 251, 83 A. 176]; and found also in the fact that as a matter of *equity* it is a fraud to act as the defendant did wherever there exists *in fact* a relationship in which confidence is reposed on one side with a resulting superiority on the other side. Pomeroy Eq.Jurisp. p. 2039, as quoted at page 17 of the trial brief).

"3. An omission which involves a breach of legal and equitable duties, and by which undue and unconscientious advantage is sought to be taken."

The plaintiff further contends that the evidence requires a finding that the defendant is not entitled to use the statute of limitations as a defense on the following grounds:

"1. Actual fraud, consisting of concealment of material facts when there was a duty to disclose them.

"2. Equitable estoppel, found in

"(a) Actual knowledge and nondisclosure of material facts when a duty to disclose them existed.

"(b) Imputed knowledge of material facts and nondisclosure under the same circumstances.

"(c) Proximate causation within the meaning of the rule stated in Patrick v. Groves and the other authorities, as set forth in the trial brief.

"3. Constructive fraud, found in

"(a) Actual knowledge and nondisclosure of material facts when a duty to disclose them existed.

"(b) Imputed knowledge of material facts and nondisclosure under the same circumstances.

"(c) Proximate causation within the meaning of the rule stated in Patrick v. Groves and the other authorities, as set forth in the trial brief."

On the contrary, the court is constrained to find that in 1920 and up to 1924, in which time the two-year period of limitations would have elapsed, there was neither knowledge of an occupational hazard in the dial-painting industry nor, in the light of the knowledge concerning radium, reason for the defendant to believe or to have known of the hazard. The defendant could not have been under a duty to disclose a hazard which, so far as it or the world knew, did not exist.

In 1920, it is a fact that dial painting was not known to be a hazardous occupation. It was only shown to be some time in 1924, or thereafter. To determine this case, the court must consider the knowledge concerning radium existing at least prior to the end of the normal period of limitations. All the learning of the scientific and medical world after that time, including the fact, which is now admitted by every one, that the occupation was highly dangerous, is not relevant, per se, to the issue.

Another way of stating this case in its final analysis is that in 1920 the head of the defendant's research bureau had failed to carry its research to the conclusion which scientific and medical experts later accepted, with some reluctance, after a number of the cases of radium necrosis had been carefully studied. Indeed, it is fair to say that until Dr. Martland established the cause, it was only by the process of elimination that suspicions pointed to radium as the trouble maker.

It can be said that this is a case wherein both the plaintiff and defendant were ignorant of the existence of facts which may have constituted a cause of action, the reason for it being the fault of neither. Medical and scientific knowledge had failed to discover the dangerous propensities of the occupation. The statute of limitations and its exceptions were not conceived for this extraordinary situation.

No one has even attempted to controvert the fact that Dr. Blum, Dr. Hoffman, Dr. Drinker, and the defendant, itself, found reason to suspect the danger in 1924; that Dr. Martland established it in 1925; but that several of the most eminent men in radium could not accept his conclusion as true until later. There are no suggestions to the contrary even by the plaintiff; but, at any rate, the court is compelled to accept the opinions of the expert witnesses to that effect and the literature which fully corroborates those opinions and the fact that no reported cases existed prior to the one to which the defendant's attention was brought early in 1924.

Going back to 1920, there was no knowledge that an occupational hazard existed in dial painting. Whether or not it could have been established, if the radium experts had put themselves to the specific task, is a matter of conjecture. Medical and scientific opinion concerning radium was going through changes, slow in process, which were the result of an increasing number of experiments. There is nothing on which a finding of negligence, in failing to discover the dangers in the industry, could be based.

There is another serious question which should be briefly considered, but the decision of the court makes it unnecessary to determine it. It is that of whether or not the conduct of the decedent and the successors to her alleged cause of action constituted laches which would prevent the plaintiff from enjoining the defense of the statute of limitations, even if the defendant was guilty of equitable fraud.

It should be remembered that the defendant was unaware of the decedent's existence after 1920; that the decedent firmly believed during 1927 that she was a victim of radium poisoning; that, in fact, she had the common symptoms of the disease experienced by other cases with whom she frequently associated; that she had had X-rays taken in 1925 which Dr. Martland read in 1930 as showing typical areas of radiation osteitis in her jawbone; that after 1927 she attended dentists and a physician and related her fears to them but was reassured by them; that she continued to suffer from the manifestations of the disease; that on October 15, 1930, Dr. Martland diagnosed her trouble as radium poisoning; that a claim was made against the defendant on May 14, 1931, for the first time; that the decedent died on June 16, 1931; and that the action at law was commenced May 17, 1932.

"It is a well-settled rule in equity that, in cases of fraud, the time limited within which the action must be brought will not commence to run until the discovery of the fraud, or until the complainant was in a situation where, by the exercise of reasonable diligence, he would have discovered the fraud." Lincoln v. Judd, 49 N.J.Eq. 387, 24 A. 318, 319; Patrick v. Groves, 115 N.J.Eq. 208, 169 A. 701.

Accordingly, it might be contended that this rule should be invoked against the decedent and her successors in view of the evidence. The action at law was not commenced until June 16, 1931. While Dr. Martland did not diagnose her case until October 15, 1930, and her physician and dentist assured her that she did not suffer from the radium affliction, she knew of her own experience that she was suffering from the usual manifestations of the disease as she had had the opportunity to ob-

serve. It was more than the suggestion of fear in her mind that troubled her. She suffered the progressive effects of the disease. Her associations with known victims with whom she even visited the offices of the radium experts when they were being treated is significant in determining whether or not she was using reasonable diligence in establishing her true condition which was probably discoverable as early as 1925.

 In view of the unanimity of opinion of all courts that the statute will not be tolled unless the plaintiff has shown "reasonable diligence," the question may well be raised here as to whether or not the decedent was required to avail herself of such medical examination as could have been made as soon as she entertained suspicions of her condition as early as 1927. Under the reasoning herein it seems unnecessary to decide this question, however.

The plaintiff contends that the decedent did voice her complaints and suspicions to at least one doctor and dentist, as early as 1927 or 1928, but was assured by them that they were unfounded. This in itself lends force to the argument of the defendant that, in fairness and equity, it could not be charged in 1917 to 1920, with the anticipation of the dangers and hazards attendant upon its industrial use of radium in the infinitesimal quantities in which it was incorporated in the luminous paint. In 1925 and 1926, nation-wide publicity was given to the discovery of radium poisoning as the cause of the ailment from which several of these dial painters suffered. In the face of this and the direct statement by the decedent that she suspected that she, too, was a victim, her own doctor and dentist in 1927 were unable to diagnose her trouble. Under such circumstances, can her employer be charged with the responsibility of anticipating such dangers in the light of the learning of the years 1917 to 1920?

Naturally there is no question as to where the sympathies of any human being would lie in a case of this sort. But a court has no power to adjust the law which has been enacted to meet the needs of a time when no such case as this could be foreseen. This is an extraordinary case even today. The statute of limitations was enacted for the purpose of protecting the public from fraud. Its ends were desirable and necessary, and in the infinite variety of cases that come before the courts that is still true. The responsibility in this case can only be laid to the tremendous progress made in science in the last four decades, for radium was unknown prior to 1898. The development of the law to meet such contingencies must of necessity lag behind their discovery. Only forward looking, intelligent legislation can protect future situations such as the one here presented.

The bill must be dismissed.

It is intended that the foregoing discussion of facts and law shall be in satisfaction of the requirements of Equity Rule 70½ (28 U.S.C.A. following section 723), concerning findings of fact and conclusions of law.

## Appendix I.

| SUBSTANCE | PERIOD OF ONE HALF LIFE. |
|---|---|
| Slow ~~ Ra | 2000 YEARS |
| Ra. Em. | 3.85 DAYS |
| Ra. A | 3 MINUTES |
| Ra. B | 26.8 MINUTES |
| Ra. C | 19.5 MINUTES |
| Slow ~~ Ra D | 165 YEARS |
| Ra E | 5 DAYS |
| Ra F | 136 DAYS |

LEGEND
▬ ALPHA
---- BETA
∿∿ GAMMA